IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VASUDEVAN SOFTWARE, INC., | No. 11-cv-06637 RS |
| Plaintiff, | |
| v. | **ORDER GRANTING SUMMARY JUDGMENT OF INVALIDITY** |
| MICROSTRATEGY, INC., | |
| Defendant. | |

## I.  INTRODUCTION

Defendant MicroStrategy, Inc. (MicroStrategy) moves for summary judgment of invalidity in connection with U.S. Patents, numbers, 6,877,006 (the '006 patent), 7,167,864 (the '864 patent), 7,720,861 (the '861 patent), and 8,082, 268 (the '268 patent) held by plaintiff Vasudevan Software, Inc. (VSi). MicroStrategy argues that the access code features of the '864, '861, and '268 patents do not meet the written description and enablement requirements of 35 U.S.C. § 112. MicroStrategy additionally contends that all four patents-in-suit fail to enable one of ordinary skill in the art to implement their "disparate" and "incompatible" databases limitations. For the reasons discussed below, although MicroStrategy has not met the standard of proving with clear and convincing evidence that the asserted claims are invalid due to lack of written description and enablement of the access code features, it has met that high standard with respect to lack of enablement of the

"disparate" and "incompatible" databases features. As the claims that fail on invalidity grounds constitute the only independent claims allegedly infringed in this action, summary judgment will be entered against VSi and in favor of MicroStrategy.

## II.   BACKGROUND

### A. The Patents-In-Suit

Mark Vasudevan is the sole named inventor of all four asserted patents. On July 19, 2000, he filed the provisional application that would eventually lead to the issuance of his first patent, the '006 patent. The '864, '861, and '268 patents are all continuation patents stemming from the '006 patent and claim priority to the provisional application filed for that patent on July 19, 2000. They relate to a federated database system that retrieves data from disparate databases to create dynamically and to display to a user a data structure called an online analytical processing (OLAP) cube. The parties have agreed that an OLAP cube is "a data structure having more than two dimensions that provides online analytical processing." OLAP systems typically use an intermediate data repository, such as a "data warehouse," that is refreshed periodically with relevant data extracted from the multiple source databases. VSi's claimed inventions, however, are directed to a specific OLAP implementation that does not use an intermediate data warehouse. Instead, the patents-in-suit claim a system that populates the OLAP cube dynamically on demand directly from the disparate source databases without going through an intermediate repository.

The patents-in-suit share a common specification, but contain different claims. VSi accuses MicroStrategy of infringing claim 2 of the '006 patent, claims 26, 33, 36, 41, 43, 45, 46, 48, and 50 of the '864 patent, claims 3 and 4 of the '861 patent, and claims 1, 2, 6, 7, 8, 9, 10, 14, and 15 of the '268 patent. The asserted claims of the '006, '864, and '861 patents all require "accessing with a computer a plurality of disparate digital databases and retrieving with a computer requested data from such databases." The asserted claims of the '268 patent require "accessing a plurality of incompatible databases of different types. . . retrieving at least a portion of the metadata from each of said plurality of incompatible databases . . . using said portion of the metadata to search the live source data in said plurality of incompatible databases . . . retrieving responsive source data,

wherein responsive source data includes live source data that is responsive to the data retrieval request." The term "disparate [] databases" was construed as "databases having an absence of compatible keys or record identifier columns of similar value or format in the schemas or structures that would otherwise enable linking data." In response to the parties' request for a clarification, the following formulation proffered by MicroStrategy was adopted: "databases having an absence of compatible keys and an absence of record identifier columns of similar value and an absence of record identifier columns of similar format in the schemas or structures that would otherwise enable linking data." "Incompatible databases of different types" was construed to have the same meaning as "disparate [] databases."

As the dynamically federated OLAP cube of the alleged inventions required live access of data stored in multiple different databases, it also created new data access security problems. These are addressed in the '864 patent by limitations pertaining to "access codes" in elements e, f, and j of independent claim 26:

> e. providing a plurality of access codes, each access code corresponding to a number of disparate databases that may be accessed with the access code,
>
> f. assigning each user an access code, and
>
> j. [*sic*] receiving and responding to a data access request only if the request is from a user with code authorizing access to all relevant constituent databases with the requested data.

The language of these claim limitations constitute the entirety of the '864 patent's discussion of access codes or a code authorizing access. There are no disclosures of the "access code" claim elements in the '864 patent other than in asserted claim 26 elements e through j, quoted above, and identical language in independent claim 1.

Claim 4 of the '861 patent similarly requires:

> g. providing access codes, each of the access codes corresponding to a number of the disparate databases that may be accessed with the access code,
>
> h. assigning a user at least one of the access codes, and
>
> i. receiving and responding to a data request from the user if the access code to which the user is assigned authorizes access to the disparate databases relevant to the requested data.

Claims 2-8 and 10-15 of the '268 patent requires:

i. receiving a plurality of access codes, each access code corresponding to one or more of said plurality of incompatible databases,

j. assigning at least one of said access codes to a user, and

k. wherein the use of metadata to search the live source data occurs only if the one or more access codes assigned to the user authorizes access to one or more of the incompatible databases.

B. Prosecution History

The provisional application included the "access code" security features, stating in the summary of the invention, "a hierarchy of user access and data update authorization is enabled by the present invention." Claim 5 of the provisional application also discloses that the "user access . . . authorization" can be implemented through the method described verbatim by elements e, f, and j of claims 1 and 26 of the '864 patent. Furthermore, it made the broad claim of being able to create OLAP cubes from "digital databases." In 2001, VSi filed a non-provisional application that claimed priority to the provisional application and incorporated it by reference in its entirety. In July of 2003, the PTO rejected that application's pending claims as obvious in light of U.S. Patent Number 6,516,324 (Jones). In an attempt to save the application over prior art Jones, Vasudevan amended the application on October 30, 2003, so that the claims only covered creating OLAP cubes from "disparate digital databases." The '006 patent issued in April 2005 and incorporates by reference the provisional application.

MicroStrategy contends that the common specification shared by the patents-in-suit does not enable one of ordinary skill in the art to 1) access and retrieve data from "disparate" or "incompatible" databases or 2) use "access codes" to secure the data in those databases. Moreover, it argues that the specification lacks any written description of "access codes" at all. VSi points out the provisional application, dating back to July 2000, included the language describing the "access code" security features which it insists therefore demonstrates that Vasudevan had possession of them since at least the time of first application filing. VSi concedes, however, that Vasudevan had not reduced the invention to practice as of the filing date of the provisional application. MicroStrategy counters that the only systems created by VSi which practice the contested "access

code" claim elements are certain versions of its "MIDaS" software, the first of which was not implemented until fall of 2003. MicroStrategy contends that the presence of the "access code" language in the provisional application is only evidence that Vasudevan realized the dynamic federated OLAP cube posed security problems necessitating the type of fix described by the "access code" claim elements, but that they were not sufficiently described or enabled. MicroStrategy's position is that Vasudevan did not accomplish enablement of the invention's security features until 2003, after years of experimentation.

As for the "disparate [] databases" claim elements, it is undisputed that Vasudevan began working on enabling these features at least as early as the fall of 2001, although MicroStrategy relies on Vasudevan's own testimony to argue that he tried to federate data from disparate data sources dynamically as early as September of 2000. It is further agreed that his work on these features was not complete until the fall of 2003. The preferred embodiment of the '864 patent instructs those skilled in the art to use an object database, such as the Jasmine or Versant databases, to implement the invention. VSi admits that during the period of experimentation, Vasudevan was unable to develop a working prototype using Jasmine or Versant, and was forced to switch to another database not identified or disclosed in the specification.

The PTO reexamined the '864 patent and issued an ex parte reexamination certificate confirming the patentability of all of its claims in January of 2009. During the reexamination, VSi submitted a claim chart titled "Application of Prior Art to the Claims," indicating that U.S. Patent Number 5,918,232 to Pouschine et. al. (the Pouschine patent) may raise a substantial new question of patentability as to every element of claims 1 and 26 except for j, which relates to the security features. MicroStrategy argues that, in doing so, VSi conceded that every element of claims 1 and 26 is disclosed by Pouschine except j, and that therefore as the only novel element of the '864 patent, the entire patent must fall if the claim element is found to be invalid.

### III. LEGAL STANDARD

A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(A). If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3; *see also* Fed. R. Civ. P. 56(c)(1)(B). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On an issue for which the nonmoving party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. All evidence must be viewed in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Anderson*, 477 U.S. at 255.

B. Validity of a Patent Under 35 U.S.C. § 112

It is settled law that all patents enjoy a presumption of validity that may be overcome only by clear and convincing evidence. *See* 35 U.S.C. § 282; *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003). MicroStrategy moves for summary judgment on the basis that the '864 patent is invalid for failure to meet two of the distinct requirements set forth under 35 U.S.C. § 112(a) (formerly 35 U.S.C. § 112, ¶1), those of written description and enablement:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

### i. Written Description Requirement

"The written description requirement requires the inventor to disclose the claimed invention so as to allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Billups-Rothenberg, Inc. v. Assoc. Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) (internal quotation omitted). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Possession can be proven "by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention. Although the exact terms need not be used in hace verba, the specification must contain an equivalent description of the claimed subject matter." *Trans Video Elecs., Ltd. v. Sony Elecs., Inc.*, 822 F. Supp. 2d 1020, 1045-25 (N.D. Cal. 2011). "The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of the art as described in the patent specification." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011) (internal quotation omitted).

### ii. Enablement Requirement

"Enablement under § 112 is a question of law with underlying questions of fact regarding undue experimentation." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA*, 617 F.3d 1296, 1305 (Fed. Cir. 2010). "It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).

In *In re Wands*, the Federal Circuit articulated the factors that a court may consider when determining whether a disclosure requires undue experimentation:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the

nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

858 F.2d 731, 737 (Fed. Cir. 1988).

### IV.  DISCUSSION

A.  Invalidity Due to Lack of Written Description of Access Code Features

Although the asserted patents' specifications do not discuss the "access code" security features, as detailed above, the '864, '861, and '268 patents contain claim limitations requiring the use of "access codes" that correspond to "disparate databases" and are used when retrieving or updating the source data in those databases to limit and secure the data retrieval process. In addition, original claims filed with the application to which the patent claims priority "are part of the original specification." *Id.* at 1349. Here, claim 5 of the provisional application discloses that "user access . . . authorization" can be implemented through the method described verbatim by elements e, f, and j of claims 1 and 26 of the '864 patent. Accordingly, "[t]o prevail, [MicroStrategy] must show that the description contained in the original claims does not adequately describe the invention. . . . [MicroStrategy]'s mere observation that the limitation language is not described in the specification or the drawings does not entitle it to summary judgment of invalidity." *Cybersource Corp. v. Retail Decisions, Inc.*, 2008 U.S. Dist. LEXIS 80370, at *11-12 (N.D. Cal. Oct. 10, 2008). "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351.

Taking the '864 patent as an example, MicroStrategy characterizes elements e, f, and j of claims 1 and 26 as recognizing the need for federated OLAP cubes to have a data security mechanism for mapping user credentials to disparate databases in order to grant users access to view, edit, and delete only the underlying information to which they should have access, but failing to disclose how to solve this problem. It argues that the claims do not meaningfully disclose the claimed invention, thereby failing to fulfill the purpose of the written description requirement. Instead, MicroStrategy's position is that the claims simply indicate that Vasudevan had identified and wished to solve this security problem as of the filing date of the provisional application.

VSi attempts to bolster the claim language by pointing to Figure 6 in the patent specification, language in the summary of the invention, and figures in the provisional application as further written description of the patent's security features. First, Figure 6 does not describe the security features because it makes no reference to access codes and fails to identify that the invention would "receiv[e] and respond[] to a data access request only if the request is from a user with code authorizing access to all relevant constituent databases with the requested data" as required by the asserted claims. Instead, it indicates solely that a software application can establish a database link using "connection methods and protocols 655." VSi argues that the specification provides at least one example of the "connection methods and protocols" mentioned in Figure 6: "OLE-DB" which "allows access to most databases" and "native connection method[s]." VSi does not explain how "OLE-DB" relates to, let alone describes, the claimed security features. Next, the summary of invention states the "present invention, for the first time, assembles an OLAP [cube] at run time, in response to a data query by a user, by accessing a plurality of incompatible source databases." VSi characterizes this as a description of the security features. This passing reference to "accessing" a database, however, does not expressly tie user access authorization to accessing disparate databases.

VSi maintains that the original claim language, alone, still satisfies the written description requirement. "Original claims are part of the specification and in many cases will satisfy the written description requirement." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011). VSi argues that they do so here by virtue of Vasudevan's description of an aspect of the invention in a claim filed as part of the original application which strongly suggests that he was in possession of that aspect of the invention as of the application filing date. From VSi's perspective, the mere fact that an original claim of the provisional application recited the same language as elements e, f, and j of claims 1 and 26 of the '864 patent demonstrates that Vasudevan had possession of the access code security features as of the provisional application's filing in 2000, and no further description of them is required for the patent to satisfy the written description requirement.

MicroStrategy disputes that the written description requirement can be automatically satisfied in that fashion. Indeed, the Federal Circuit has confirmed that district courts may grant

summary judgment of invalidity for lack of written description in such circumstances. *See Ariad*, 598 F.3d at 1349; *Fiers v. Revel*, 984 F.2d 1164, 1170 (Fed. Cir. 1993). Even if the provisional application included the same claim language as the patent, if the written description in the provisional application's original claims merely evinced the inventor's "wish" or "plan" to invent what was claimed, the patent may be invalid for lack of written description. *Fiers*, 984 F.2d at 1170. "Although many original claims will satisfy the written description requirement," VSi concedes, "certain claims may not." *Ariad*, 598 F.3d at 1349. "For example, a generic claim may define the boundaries of a vast genus of chemical compounds, and yet the question may still remain whether the specification, including original claim language, demonstrates that the applicant has invented species sufficient to support a claim to a genus." *Id.* VSi argues that original claims are more likely to be insufficient in unpredictable, primitive, or uncertain technology areas, such as chemistry and life sciences, but not in more advanced and established fields such as computer science.

    VSi's technical expert, Dr. Cardenas, opines that the claim language of elements e, f, and j sufficiently convey to a person of ordinary skill in the art (whom he describes as having an "M.S. or Ph.D. degree in computer science") that Vasudevan had possession of the "access code" security features as of the filing date of the provisional application. Dr. Cardenas declares that "[p]ersons of ordinary skill have known of database 'access codes,' such as a username and password—certainly by July 2000 priority date of VSI's '864 patent." Dkt. 226-10 at 55. As an example that this knowledge was commonplace by 2000, Dr. Cardenas points to his own book, which described such security features as early as 1979. Accordingly, Dr. Cardenas concludes, "persons of ordinary skill certainly would have known how to make and use a data storage medium that provided such 'access codes' without undue experimentation." *Id.* at 56. Although MicroStrategy discounts Dr. Cardenas's opinion as conclusory, it has not submitted any contrary evidence. The Federal Circuit counsels that "[w]here there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." *Crown Packaging*, 635 F.3d at 1384. Given that MicroStrategy did not submit conflicting expert testimony, but merely questions the weight that should be given to that of VSi's expert, summary

judgment on the basis of lack of adequate written description is unwarranted. VSi has raised a material question of fact as to whether the claim language alone provided a sufficient written description of the "access code" security features to demonstrate that Vasudevan was in possession of them at the time he filed the provisional application.

### B. Invalidity Due to Lack of Enablement of the Access Code Features

MicroStrategy argues that there is no need for the Court to apply the *Wand* factors here because the '864 patent provides no enabling disclosure whatsoever. VSi contends that those factors should be applied because the original claims themselves constitute the disclosure. As previously noted, original claims filed with the application to which the patent claims priority constitute part of the original specification. *See Ariad*, 598 F.3d at 1349. Accordingly, the *Wands* factors are applied below to determine whether this original claim language enables the claimed invention.

VSi characterizes the specification's guidance for enabling the "access code" features as meaningful, describing the claims as detailed and clearly identifying the functionality of the security features. VSi primarily supports this argument with the expert report of its technical expert Dr. Cardenas, who opines that the claim language, by itself, enables the security features. As noted above, he states that by 2000, when the provisional application was filed, techniques for providing access codes for databases were well known to a person of ordinary skill in the art. In light of the advanced state of that art, a person of ordinary skill, in a predictable field such as software, would have been able to code the security features without undue experimentation.

MicroStrategy argues that VSi may not rely on a person of ordinary skill in the art's familiarity with typical user name and password security features to enable the access code features of the alleged inventions. According to MicroStrategy, this is because Vasudevan testified at his deposition that the "access codes" are part of "a fine grain security model" requiring more than just user names and passwords. Declaration of Howard Chen in Support of Motion for Summary Judgment of Motions for Summary Judgment (Chen Decl.), Ex. 24, Vasudevan Depo Transcr. 50-51. Vasudevan further testified that his "fine grain security model" differed from those that had

been used before because previous security models were used only on individual databases. *Id.* MicroStrategy also characterizes as ambiguous testimony of Dr. Cardenas in describing the "access codes" features as complex and new. Chen Decl., Ex. 38, Cardenas Depo Transcr. At 188-89. MicroStrategy maintains that this testimony is dispositive and, therefore, that under a *Wands* analysis, undue experimentation would be required for one of skill in the art to implement the alleged invention of using access codes to control access to disparate databases within the context of the invention.

MicroStrategy additionally asserts that VSi is estopped from arguing that the claim language in combination with the knowledge of a person of ordinary skill in the art enables the "access codes" features because, during the reexamination of the '864 patent, VSi conceded to the PTO that element j of claims 1 and 26 is the only element not disclosed by prior art Pouschine. "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005). From MicroStrategy's perspective, VSi's statements to the PTO were tantamount to an admission that element j of claims 1 and 26 represents the only novel aspect of the invention leading the PTO to confirm the patentability of the '864 patent over Pouschine based on that representation. MicroStrategy argues, therefore, that VSi may not rely upon one having ordinary skill in the art to "flesh out" or supplement the claim language in lieu of an enabling disclosure because it is "the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech*, 108 F.3d at 1366. "The novel aspects of the invention must be disclosed and not left to inference, that is, a patentee may not rely on the inference of a person of ordinary skill in the pertinent art to supply such novel aspects." *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1380 (Fed. Cir. 2002).

The Examiner ultimately described element j as the most important element of the independent claims and granted a reexamination certificate based on the Pouschine patent's lack of the access code scheme. MicroStrategy argues that VSi's may not now disavow its statements to the

No. 11-CV-06637 RS
ORDER ON MOTION FOR SUMMARY JUDGMENT
12

PTO during reexamination. It insists that, alone, the claim language does not supply the novel aspects of element j, and therefore application of estoppel against VSi would be fatal to the validity of the '864 patent and the other patents-in-suit.

VSi denies that the statements it made in the reexamination are binding on its litigation positions because the standards applied during each procedure are different. During reexamination, VSi, as the requester, had the obligation to identify to the PTO the claims for which it was requesting reexamination and to disclose to the PTO prior art that could "raise[] a substantial question of patentability where there is a substantial likelihood that a reasonable examiner would consider the prior art patent . . . important in deciding whether or not the claim is patentable." Manual of Patent Examining Procedure (MPEP) § 2242. Furthermore, the claims that are the subject of reexamination should be given their broadest reasonable construction consistent with the specification, which may result in the PTO construing them differently than they are later construed in litigation. *See Therasense, Inc. v. Becton, Dickenson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc); *see also* MPEP § 2258(1)(G). Finally, the PTO applies a preponderance of the evidence standard to invalidity claims by an accused infringer during reexamination, whereas here, the clear and convincing standard applies. *See Therasense*, 649 F.3d at 1292. VSi explains its reexamination claim chart does not constitute an admission that the security features in element j of claims 1 and 26 are the only novel limitations of the '864 patent owing to these differences between the standards applied by the PTO during reexamination and those applicable in federal courts. For this reason, VSi's reexamination request explicitly underscored "that the validity positions described herein . . . are not necessarily the positions VSi would take in . . . any litigations."

MicroStrategy has identified only one case in support of the proposition that statements before the PTO similar to those made by VSi constitute a binding admission that a particular claim element is the only novel limitation of a patent. *DatCard Sys., Inc. v. Pacsgear, Inc.*, a slip opinion from the Central District of California, held that the patentee's statements to the PTO regarding what elements of the alleged invention were disclosed in the prior art were binding for purposes of an obviousness determination on summary judgment of invalidity. No. 8:10-cv-012288-MRP-VBK (C.D. Cal. Mar. 12, 2013), Slip Op. at 9. In *DatCard*, however, the patentee made its statements in

the context of an Accelerated Examination Support Document (AESD) during an Accelerated Examination procedure. To participate in that specialized procedure, a patentee must file an AESD identifying references in the prior art most closely related to the claims and make admissions regarding which references disclose elements of the claimed features. *See* Changes to Practice for Petitions in Patent Applications To Make Special and for Accelerated Examination, 71 Fed. Reg. 36324-25 (June 26, 2006). In other words, in exchange for a quicker examination, an applicant is required to make statements that will trigger prosecution history estoppel. VSi, by contrast, was not participating in an Accelerated Examination and the PTO did not necessarily consider its claim chart to constitute such admissions. Rather, the purpose of VSi's claim chart was only to identify prior art that a reasonable examiner would consider important in deciding whether or not its claims were patentable.

Despite conclusorily asserting that a *Wands* analysis would weigh against enablement, MicroStrategy has not performed one. By contrast, VSi's own *Wands* Analysis finds that seven of the eight factors weigh in favor of a finding that no undue experimentation would be necessary. VSi contends: 1) although Vasudevan admittedly did not practice the invention until 2003, approximately three years after filing the provisional application, only about 200 hours of experimentation were required to implement the security features; 2) the amount of direction or guidance presented is meaningful because the claims are detailed and clearly identify the functionality that provides the necessary guidance; 3) VSi concedes that there was an absence of working examples at the time the provisional application was filed, weighing against enablement; 4) the nature of the invention is in the software field, which is predictable with well-developed languages that have been used and understood for years; 5) the state of the prior art includes security features; 6) the relative skill of those in the art is relatively high, having advanced degrees; 7) the predictability of the art is high; and 8) the breadth of the claims are not large because they are limited to database-level security.

Drawing all inferences in favor of VSi as the nonmoving party, there is at least a question of material fact as to whether it admitted to the PTO that element j of claims 1 and 26 is the only novel aspect of the alleged invention of the '864 patent. If element j is not, it is permissible for the person

of skill in the art to supplement the language of element j with his or her own knowledge of the prior art to enable the claimed security features. While MicroStrategy characterizes the deposition testimony of Vasudevan as dispositive evidence that the "access code" features of the asserted patents were not limited to mere user names and passwords but instead covered a new and different fine-grained security model, VSi points to Vasudevan's further testimony contradicting this conclusion, in which he said he believed a user name and password to be an "access code." Chen Decl., Ex. 24, Vasudevan Depo Transcr. 51. A material question for trial exists as to the nature of the "access code" features of the asserted patents. If they were not novel elements, given Dr. Cardenas's additional testimony that a person of ordinary skill in the art would have sufficient knowledge to enable the features without undue experimentation, and considering the fairly high skill of such a person, the advanced state of the prior art, and the predictability of the art, a reasonable finder of fact could determine that they are enabled. If the finder of fact determined that the "access code" features were new, complex, and novel aspects of the alleged inventions, then it could find that the specifications of the asserted patents were not sufficient to enable them. MicroStrategy's motion for summary judgment of invalidity cannot be granted to the extent it is specifically based on the lack of enablement of the "access code" features.

C. Invalidity Due to Lack of Enablement of the "Disparate" or "Incompatible" Databases Features

Finally, MicroStrategy argues that all of the patents-in-suit are invalid due to their failure to teach those skilled in the art how to make and use the full scope of the claimed invention's "disparate" or "incompatible" databases features without undue experimentation, as evidenced by Vasudevan's own failure to do so.[1] Again, it takes the position that it is unnecessary to apply the *Wands* factors because the patent lacks sufficient written disclosure of the "disparate [] databases" limitations. *See Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-98 (Fed. Cir. 1999); *Genentech*, 108 F.3d at 1366. As discussed above, however, VSi has raised at least a material question of fact as to whether the written description of the disparate databases

---

[1] As the "incompatible databases" claim term of the '268 patent has been construed to have the same meaning as the "disparate [] databases" term used by the '006, '864, and '861 patents, the terms "disparate" and "incompatible" are used synonymously herein.

limitations are sufficient. Accordingly, the *Wands* factors are again weighed below to determine whether that claim language is sufficiently enabled.

VSi admits that the period of Vasudevan's experimentation lasted from at least the fall of 2001 through the fall of 2003. It argues, however, that Vasudevan spent less than one year of his time during this period working to enable the disparate databases features, and that his additional work during the period related to other features or products. VSi describes Vasudevan's experimentation as necessary to overcome the deficiencies in existing products such as Jasmine ii and Versant. It contends that during the period of experimentation, 90% of Vasudevan's efforts were directed to the MIDaS product as a whole, and approximately 50% of his MIDaS efforts were focused on the disparate databases features in particular. Vasudevan provided a declaration stating that from late 2001 through 2003, he worked 60-80 hours per week.

Relying on Vasudevan's own representations, MicroStrategy calculates that he spent between 3,159 and 4,212 hours just to reduce the disparate databases limitations to practice. MicroStrategy argues that this amount of experimentation is undue, representing between one and a half and two years of labor. VSi does not quibble with TIBCO's math, but describes the number of hours worked as the equivalent of only one year of experimentation. Working at an aggressive pace of fifty hours a week during fifty weeks of a year still only amounts to 2,500 hours of work during that period, far below the minimum of 3,159 hour of work that Vasudevan concedes having spent experimenting to enable the disparate databases features. A more reasonable pace of forty hours a week for fifty weeks of the year would result in 2,000 hours of work during the year. At that pace, Vasudevan's own calculations lead to the conclusion that enabling the disparate databases features would require a person of ordinary skill in the art to experiment for eighteen to twenty-five months to enable the features. This extended period of experimentation weighs heavily in favor of a finding of invalidity.

The amount of guidance provided is a factor closely related to the issue of whether the patent contains an adequate written description, as discussed above. The parties hotly dispute the amount of guidance provided by the specification for enabling the invention, raising many of the same arguments advanced with respect to the adequacy of the patent's written description. MicroStrategy

describes the patent's guidance as minimal, arguing that the only mention of "disparate databases" in the specification states that although prior-art systems "can perform complex collation and correlation of data derived from a large and disparate set of databases, the databases have to be pre-configured at the design-time of the information systems." The specification identifies "key parameters" as the "solution" to this issue, but MicroStrategy argues that it provides no guidance on how to devise such a "parameter." VSi, by contrast, describes the specification as providing paragraph after paragraph of enabling description, including figures that demonstrate how to connect to disparate databases and to assemble an OLAP cube from the retrieved data. In particular, it points to VSi's technical expert, Dr. Cardenas, who opines that the invention is enabled by disclosure of a "serialized file" and "correlation parameters." Delcaration of Allan Bullwinkel in Support of VSi's Opposition, Ex. 6, Expert Report of Dr. Alfonso Cardenas, ¶806. MicroStrategy dismisses this testimony as an expert's impermissible attempt to "rewrite" the specification in an effort to create a genuine issue of fact. *See Default Proof Credit Card Sys. Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("[patent holder] cannot use the declaration of its expert to rewrite the patent's specification.").

      MicroStrategy raises an additional argument regarding the guidance provided by the patent that is persuasive. It points out that, in certain respects, the specification teaches away from a working embodiment. MicroStrategy notes, and VSi does not dispute, that a number of figures in the patent are screenshots from software that does not and cannot practice the claimed invention. In fact, the specification describes the preferred embodiment of the invention as being implemented through the use of the Jasmine database. Vasudevan, however, testified that despite his best efforts, he could not implement the invention using that particular database, as the specification instructs. Rather than teaching how to make the invention, the specification teaches away from a working embodiment. This is evidence that the specification does not enable the invention. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007).

      VSi concedes that Vasudevan lacked a working example of the invention at the time the provisional application was filed, but argues that the law does not require reduction to practice prior

to filing. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 61-62 (1998). Nonetheless, this factor too weighs against enablement.

The nature of the invention also weighs against enablement as VSi's own expert testified that the problem solved by the invention had confounded inventors for 20 years, just as the creation of an OLAP cube from disparate databases "was unknown" previously. As for the next factor, state of the prior art, VSi contends that it included both OLAP and federation technology, and that its patent merely combines them in a novel way. Accordingly, VSi insists that one of ordinary skill in the art would be able to rely on his or her knowledge of the advanced state of the prior art to enable the invention without undue experimentation. The testimony of VSi's own expert, Dr. Cardenas, that "there was no teaching to perform OLAP using a federated database" at the time of the invention, undermines this position. Both Vasudevan and Dr. Cardenas testified that they knew of others who had tried and failed to implement the invention prior to the filing of the provisional application, including well-established computer software company, Computer Associates. This failure of others to practice the alleged invention, even in light of the state of the prior art, supports a finding of undue experimentation.

As previously noted, the parties agree that the relative skill of those in the art is high, with a person of ordinary skill having either a Ph.D. in computer science or engineering with an emphasis in computer programming or information technology, as well as experience in database design and administration, or a bachelor's degree in those fields with additional years of experience substituting for a graduate degree. It is also worth noting that Dr. Cardenas describes Vasudevan as a person of extraordinary skill in the art, yet it admittedly took Vasudevan at least three thousand hours of experimentation to reduce the alleged invention to practice. Presumably, the experimentation required of one of merely ordinary skill in the art to achieve the same results would be even greater.

Predictability of the art favors enablement because, as VSi posits, the invention is in the software filed, which is a predicable art with well-developed computer languages. Coding in such languages would be within the ken of the person of ordinary skill in the art. Furthermore, database technologies have existed for many years. Although MicroStrategy points to Vadudevan's own inability to predict which third-party tools could be used to implement the invention to argue that

the art is unpredictable, this argument is properly directed to the amount of experimentation required. It is not a commentary on the state of computer science or software as a field, which has reached a level of predictability.

      VSi describes the claims as "drawn to a niche area in OLAP technology" and therefore favoring enablement. MicroStrategy characterizes the claims as broad because they encompass every method of accessing incompatible or disparate databases to generate OLAP cubes, rather than one specific method. It notes that VSi has only identified one enablement of its disparate databases features, involving correlation parameters and serialized files. Enablement, however, must be commensurate with the scope of the patent claim. *Nati'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999). "The scope of the claims must be less than or equal to the scope of the enablement." *Id.* at 1196. Here, because the relative breadth of the claims is greater than the scope of the enablement, and they fail to explain how the patent's disclosures could be used to generate OLAP cubes from the wide variety of databases VSi claims are disparate, this factor weighs against enablement.

      Overall, the *Wands* factors weigh heavily in favor of invalidity due to lack of enablement. The burden of proving invalidity by clear and convincing evidence is high, but MicroStrategy has met it in this instance. It is undisputed that at the time Vasudevan filed the provisional application, he was not in possession of a working example of the "disparate" databases features it claimed. The specification of that provisional application included screen shots from software that could not be used to practice the alleged invention, thereby teaching away from enablement. Moreoever, it took Vasudevan, whose own expert described him as one of extraordinary skill in the art, more than three calendar years to enable those features. During that period of experimentation, Vasudevan's own declaration undisputedly establishes that he spent a minimum of 3,159 and as many as 4,212 hours working to reduce the disparate databases limitations to practice. MicroStrategy's motion for summary judgment of invalidity of the patents-in-suit due to lack of enablement regarding the "incompatible" and "disparate" databases features must therefore be granted.

V. CONCLUSION

VSi has alleged that MicroStrategy's accused products infringe upon independent claim 2 of the '006 patent, independent claim 26 of the '864 patent, as well as claims 33, 36, 41, 43, 45, 46, 48, and 50 that depend upon it, independent claim 3 of the '861 patent, and claim 4 that depends upon it, and independent claim 1 of the '268 patent, and claims 2, 6, 7, and 8 dependent upon it, and independent claim 9 of that same patent as well as its dependent claims 10, 14, and 15. In that invalidity due to lack of enablement infects all of the independent claims involved in the patents-in-suit, and all remaining asserted claims are dependent upon those same independent claims, the effect of this order is that all claims of the patents-in-suit asserted by VSi against MicroStrategy are invalid. Accordingly, summary judgment of invalidity is entered in favor of MicroStrategy and against VSi.

IT IS SO ORDERED.

Dated: 10/17/13

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE